IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 2:18-CR-103-WKW-GMB |
| | ) | [WO] |
| ROGER LEWIS WRIGHT | ) | |

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Two motions filed by Defendant Roger Lewis Wright are pending before the court. The first is a Motion to Suppress (Doc. 16), which has been amended and supplemented (Doc. 27), and the second is a Motion for Disclosure of Informant (Doc. 18).   The court held an evidentiary hearing on the motions on July 12 and August 3, 2018, and has reviewed the Government's responses to the motions (Docs. 19 & 20), along with the parties' evidentiary materials.   For the reasons to follow, the Magistrate Judge RECOMMENDS that the Motion to Suppress (Doc. 16) be GRANTED in part and DENIED in part, and that the Motion for Disclosure of Informant (Doc. 18) be DENIED.

## I.   INTRODUCTION

A Grand Jury sitting within the Middle District of Alabama indicted Wright on a single count for the possession of a firearm by a convicted felon. Doc. 1.   Wright claims in his motion to suppress that the Government obtained the evidence supporting this charge through an illegal search of his residence.   Specifically, Wright seeks to suppress "all evidence found, statements made, and information obtained" as a result of the search of his home. Doc. 16 at 1.   He also seeks to suppress the statements he made to police officers after his arrest.   The court recommends that his request to suppress the information

obtained during the search of his apartment be denied, but that his post-arrest statement be suppressed.

In addition, Wright claims in his motion for disclosure of the identity of the confidential informant that he must know the informant's identity in order to challenge the propriety of the search warrant.   The court finds that the disclosure of the informant's identity is not warranted and that this motion is due to be denied.

## II.   FACTS

The testimony and evidentiary materials offered at the hearing on Wright's motions established the following facts.

Ebony ("E.L.") Dailey is employed as a narcotics detective for the Montgomery Police Department ("MPD"). Transcript of July 12, 2018 Hearing ("Tr. I") at 80–81. Around September 2016, a confidential informant approached her about an individual who, according to the informant, was selling drugs from his residence in the Cambridge Park Apartments in Montgomery, Alabama. Tr. I at 82–83 & 88.   Dailey had a prior relationship with this informant, who had been providing information to MPD for payment for more than two years. Transcript of August 3, 2018 Hearing ("Tr. II") at 12–13.   A day or two later, Dailey used the informant to conduct a controlled buy of cocaine powder in Cambridge Park from a man the informant identified by the nickname "Ballhead." Tr. I at 83 & Doc. 46-3 at 4.   The informant surreptitiously made an audio and video recording of the transaction, and Dailey listened to the audio feed in real time. Tr. I at 100.

Using the information generated by the informant, Dailey prepared a search warrant

and affidavit for Ballhead's apartment.   On the face page of the warrant and within the affidavit, Dailey listed the property to be searched as "2243 Bonaparte Boulevard Apartment D." Doc. 46-3 at 2–5.   In the affidavit, she described Ballhead as a "black male in his 40's, dark complexion, approximately 6'1, approximately 240 pounds and ball haircut." Doc. 46-3 at 4.   Dailey disclosed that this information came from a confidential informant identified in the affidavit with the shorthand "A." Doc. 46-3 at 4.   Dailey did not disclose in the affidavit that she paid for the information, but she did include the statement that the informant "has provided accurate and reliable information to the Montgomery Police Department that has led to the prosecution of numerous offenders." Doc. 46-3 at 3.   Dailey also included the qualifier that the affidavit was "based on the personal knowledge of this affiant and on facts obtained by the Montgomery Police Department Narcotics and Intelligence Bureau." Doc. 46-3 at 4.

Dailey disclosed in the affidavit that, according to the informant, the man known as Ballhead had been selling illegal drugs from his apartment during the month of September 2016. Doc. 46-3 at 4.   In addition, Dailey's affidavit described the controlled purchase of cocaine powder as follows:

> [I]n the month of September 2016; "A" under the direct control and supervision of Detective E.L. Dailey #2464 and Detective M.T. Dees #1736 went to 2243 Bonaparte Boulevard Apartment D Montgomery, AL to attempt to make a controlled purchase.   "A" advised he/she walked to the residence and was allowed to enter the apartment by "Ballhead."   Once inside the residence "A" asked "Ballhead" for a quantity of powder cocaine. "Ballhead" then retrieved the powder cocaine from the hallway closet and handed it to him/her.   "A" advised that he/she gave "Ballhead" the quantity of the Montgomery Police Department Drug Buy Money.   **This controlled buy occurred within 72 hours of the issuance of this warrant.**

3

Doc. 46-3 at 4.

Dailey included three attachments to her affidavit.   Attachment I lists the items subject to the search. Doc. 46-3 at 6.   Attachment II is a picture of a door marked with a small letter "D." Doc. 46-3 at 7.   Attachment III is an aerial photograph of a portion of the Cambridge Park Apartments. Doc. 46-3 at 8.   To this image, Dailey added the text "Target Apartment, 2nd floor on right." Tr. I at 88.   She also circled one of the buildings in the complex and drew an arrow from her text to this building. Doc. 46-3 at 8.   On this showing, a municipal court judge sitting within the City of Montgomery authorized the warrant on September 15, 2016 at 11:50 a.m. Doc. 46-3 at 5.

Later on September 15, Dailey assembled an MPD Special Weapons and Tactic ("SWAT") team to brief them on the search. Tr. I at 102–03.   She used the image in Attachment III to explain where the search would be conducted. Tr. I at 69–70 & 102–05. What Dailey did not know at the time is that the building identified in Attachment III was not 2243 Bonaparte Boulevard, as described in the warrant, but 2247 Bonaparte Boulevard. *See* Doc. 46-3 at 7 & 8.   Although Dailey did not know then that she had used the wrong address in her affidavit, she knew the route the informant had walked to Ballhead's apartment from her review of the video recording immediately after the controlled buy, and she knew that this route leads to Apartment D in the building depicted in Attachment III. Tr. I at 102 & 104.   Following Dailey's briefing, the SWAT team executed the search warrant at 2247 Bonaparte Boulevard, Apartment D, where they arrested Wright, Tr. I at 103, and found evidence of drug trafficking along with the firearm supporting Wright's

4

pending federal charge. Doc. 46-5 at 10.

Following the arrest, Dailey and Detective Robert Franklin Hubbard, also of MPD, conducted an interview of Wright. Tr. II at 18–19.   The interview was audio recorded and began at 2:57 p.m. on September 15, 2016. Government's Exhibit 4 ("Gov't Ex. 4") at 00:07.   After a few preliminary questions, Dailey advised Wright of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), during the following exchange:

| | |
|---|---|
| Dailey: | Alright, I'm gonna read your rights to you.   Before I ask you any questions, I must explain to you that you can remain silent and that anything you say can be used against you in the court. You can talk to a lawyer first, and that you have the right to advice and the presence of a lawyer even though you cannot afford to hire one.   If you cannot afford to hire a lawyer, and want to have one present during interrogation, the court would appoint one before we ask questions.   If you want to answer questions now, you can do so, but you can stop at any time. |
| Wright: | Naw, I'd like my lawyer. |
| Dailey: | You'd like your lawyer? |
| Wright: | Yeah. |
| Dailey: | You don't want to answer no questions? |
| Wright: | Naw, but look here, what I'm [unintelligible]… |
| Dailey: | Now hold on, hold on! |
| Wright: | OK. |
| Dailey: | I just read you your rights. |
| Wright: | Yes, ma'am. |
| Dailey: | You don't want to answer no questions? |

Wright:        Naw.

Dailey:        So you're ready for us to send you to jail?

Wright:        Yeah…what, what questions I'm answering?    What, what
               y'all got?    What y'all [unintelligible]…

Dailey:        You ain't giving us a chance to ask you.

Wright:        Well go on and ask me then.

Dailey:        OK, hold on.

Wright:        Yeah.

Dailey:        You gonna answer questions, you gonna read this statement
               out loud.

Wright:        What?

Dailey:        I'm, I'm fixin' to let you read the statement.    Right here.
               Read that out loud.

Wright:        I fine to understand, I fully understand the foregoing statement
               do under agree to answer questions.[1]    I understand in no way
               I am doing.    No promises or threats have been made to me by
               anyone.    And no pressure of any kind has been made against
               me by anyone.    Now I read the top part again?

Hubbard:       Is that a…

Wright:        Huh?

Hubbard:       Is that a true statement?

Wright:        Say what now?

---

[1] Admittedly, this recitation contains unintelligible sentence fragments, but it is an accurate transcription of the recording to the court's ears.    No party offered a proposed transcript and the Government could not produce a copy of the written statement from which Wright ostensibly reads during his interview. Tr. II at 16–17.    These problems might well prevent a finding of intelligent waiver of Wright's Fifth Amendment rights if, as discussed below, the officers had not already violated those rights by the time they sought this waiver.

| | | |
|---|---|---|
| Dailey: | | Is that a true statement? |
| Hubbard: | | Is that a true statement? |
| Wright: | | Yes, sir.   It's a true statement. |
| Dailey: | | OK.   Go ahead and sign right here.   Right here. |
| Wright: | | I want to read it all through it again right quick. |
| Dailey: | | I just read it to you. |
| Wright: | | Yeah, I want to read the, uh…before [unintelligible]…Oh, yeah I got you now…what, I just sign right here right? |
| Dailey: | | Yeah just sign right here.   Right here. |

Gov't Ex. 4 at 00:27–02:20.   Later during the interview, Wright made inculpatory admissions. *See* Doc. 46-5 at 35.

## III.   DISCUSSION

### A.   Motion for Disclosure

The first pending motion seeks the disclosure of the identity of the informant whose information Dailey used in obtaining a search warrant for Wright's apartment.   The compelled disclosure of a confidential informant requires a balancing of "the public interest in protecting the flow of information against the individual's right to prepare his defense." *Roviaro v. United States*, 353 U.S. 53, 62 (1957).   "But the rule is well-established that the Government need not disclose the identity of an informer when the sole purpose to be served is to attack the probable cause supporting a search warrant." *United States v. Mendoza*, 433 F.2d 891, 894 (5th Cir. 1970) (citations omitted).   Here, the inquiry is a

narrow one.   Wright, through counsel, confirms that the informant's identity is relevant to his challenge of the search warrant only if Dailey orally provided information to the authorizing judge that was not reflected in her affidavit. Tr. I at 6–8; *see also Roviaro*, 353 U.S. at 61 ("Most of the federal cases involving this limitation on the scope of the informer's privilege have arisen where the legality of a search without a warrant is in issue and the communications of an informer are claimed to establish probable cause.").   There has been no evidence of this sort, as Wright concedes. Tr. II at 32.   The simple fact that Wright challenges the informant's reliability does not justify the compelled disclosure of her[2] identity.   The court recommends that this motion be denied.

**B.    Motion to Suppress**

In his initial and amended motion to suppress, Wright presents a number of arguments for invoking the exclusionary rule to suppress the Government's evidence against him, which can be summarized as follows:

1.    The search warrant was defective because it did not authorize a search of 2247 Bonaparte Drive, Apartment D;

2.    The search warrant did not show probable cause for the search because it (a) did not establish the reliability of the information obtained from the confidential informant, (b) omitted her history of working as an informant for MPD and payment for this work; and (3) did not differentiate between factual assertions in the warrant based on

---

[2]  Although the informant's identity has not been disclosed, the Government used the pronouns "she" and "her" when discussing the informant during the suppression hearing. *See, e.g.*, Tr. I at 118.

the personal knowledge of the affiant and on the knowledge of other police officers; and

3.      Wright's post-arrest interview violated his Fifth Amendment right to counsel, which he invoked but the MPD officers did not honor.

For the reasons explained below, the court finds that the search warrant, although somewhat carelessly drafted, does pass constitutional muster.   Wright's interview, however, must be suppressed because the officers failed to terminate the interview upon his unequivocal request for counsel.

### 1.   *Search Warrant*

#### A.   **Particularity**

Wright's first challenge to the search warrant implicates the Fourth Amendment's requirement that a warrant "particularly describ[e] the place to be searched." U.S. CONST., amend. IV.   As noted above, on the face page of the warrant and in five locations within the affidavit the property is described as 2243 Bonaparte Boulevard, Apartment D, but the MPD officers executed the warrant at 2247 Bonaparte Boulevard, Apartment D.   This fact alone does not mandate the suppression of the evidence seized during this search because "[a]n erroneous description of premises to be searched does not necessarily render a warrant invalid." *United States v. Burke*, 784 F.2d 1090, 1092 (11th Cir. 1986).   Instead, the "Fourth Amendment requires only that the search warrant describe the premises in such a way that the searching officer may 'with reasonable effort ascertain and identify the place intended.'" *Id.* (quoting *United States v. Weinstein*, 762 F.2d 1522, 1532 (11th Cir. 1985) (citations omitted)).   Binding Eleventh Circuit authority compels the conclusion that the

search warrant at issue here contained an adequate description of the property despite listing the incorrect address.

The court may consider a warrant's attachments in assessing whether the warrant satisfies the Fourth Amendment. *E.g.*, *Weinstein*, 762 F.2d at 1531 (citations omitted). Attachment II reflects that the correct door is marked with a "D," but most of the buildings in the apartment complex have an apartment D.[3] Tr. I at 17–18.   Attachment III, however, is the warrant's saving grace.   This aerial image, as edited by Dailey, describes one and only one unit—2247 Bonaparte Boulevard, Apartment D. Tr. I at 104.   This is the same unit where the confidential informant conducted the controlled buy of cocaine. *E.g.*, Tr. I at 102 & 104.   It is also the same unit Dailey described for the SWAT team in her pre-search briefing. Tr. I at 69–70 & 102–05.

The Eleventh Circuit considered a similar warrant and search in *Burke*, where the warrant described the property to be searched as follows: "38 Throop Street, is a two-story red brick building, trimmed in a reddish-brown paint with a shingled roof and three adjacent apartments, with apartment 840 being the far left apartment at that address looking at it from the front." *Burke*, 784 F.2d at 1091.   Burke did live in apartment 840, but at 48 Troup Street. *Id.* at 1092.   Although the warrant listed the wrong address and street name, the officers rode by the location before executing the warrant and the affiant told the

---

[3] Dailey testified that Attachment II is a single frame taken from the informant's video. Tr. I at 102. Although Wright's counsel argues that the door in the attachment has a bluish hue and therefore cannot be the white door of Wright's apartment as it was painted in September 2016, the court has reviewed the attachment and video and finds that there is no basis for concluding that the image and video do not depict the same door.

searching officers which building was to be searched, correctly identifying the building at 48 Troup Street. *Id.*   The resulting search of Burke's apartment yielded a firearm, and based on this evidence a grand jury returned an indictment charging her with a violation of 18 U.S.C. § 922(g)(1). *Id.*

The district court suppressed the firearm and the Eleventh Circuit reversed this ruling on appeal, noting that a "warrant's description of the place to be searched is not required to meet technical requirements or have the specificity sought by conveyancers. The warrant need only describe the place to be searched with sufficient particularity to direct the searcher, to confine his examination to the place described, and to advise those being searched of his authority." *Id.*   In finding this standard met, the court observed that the warrant "contained a detailed physical description of the building, minimizing the possibility that an apartment in any building other than the correct one would be searched." *Id.* (citing *United States v. Figueroa*, 720 F.2d 1239, 1243 n. 5 (11th Cir. 1983), for the proposition that a "mistaken address [is] 'inconsequential in light of a clear description of the name of the building and its physical appearance'").   The warrant also "correctly named the apartment number, and there was only one apartment with the number '840'" in the housing project where Burke lived. *Id.*   Finally, the court relied on the "knowledge of the officer executing the warrant" even though that "knowledge was not reflected in the warrant or in the affidavit supporting the warrant." *Id.* at 1093.   That is, the court noted that the affiant knew which apartment was to be searched and communicated that location to the officer who performed the search, minimizing the risk of an errant search. *Id.*

The *Burke* warrant is materially identical to the instant warrant.  Both warrants, when taking into account their attachments, list the incorrect address but provide a detailed description of the correct premises.   Leaving aside the incorrect addresses, both warrants identify only one apartment.   In *Burke*, this is because there was only one apartment 840 in the relevant housing complex.   Here, this is because Attachment III identified only one apartment.   In both cases, the one unit that the warrant identified was the one unit the officers had probable cause to search.   Finally, in both instances the affiant knew the correct unit and communicated this fact to the officers conducting the search.   Just as the Eleventh Circuit held in *Burke*, "under these circumstances, the search warrant described the premises to be searched with sufficient particularity to direct the officers to the correct apartment, to confine the officers' examination to that apartment, and to place the occupants on sufficient notice of the officers' authority to search the premises." *Id.* at 1093. This is all the Fourth Amendment requires. *Accord United States v. Haydel*, 649 F.2d 1152, 1157 (5th Cir. 1981), *opinion corrected*, 664 F.2d 84 (5th Cir. 1981) (finding "no danger that the less-than-perfect description on the face of the warrant allowed the officers to conduct a random search" despite an incorrect street name and street number).

### B.     Probable Cause

Wright challenges the search warrant's articulation of probable cause for the search of his apartment on multiple grounds.   Ultimately, none are availing.

Most significantly, Wright claims that the search warrant does not establish the reliability of the confidential informant because it contains only a conclusory statement of

corroboration and omits the fact that the informant had long been paid by MPD for her services.[4]   "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts"—and must be judged on the totality of the circumstances presented in each case. *Illinois v. Gates*, 462 U.S. 213, 232 (1983).   Wright's chief complaint is that the warrant states, by way of corroboration of the informant, merely that she "has provided accurate and reliable information to the Montgomery Police Department that has led to the prosecution of numerous offenders." Doc. 19-1 at 4.   This is precious little corroboration, but after *Gates* the Eleventh Circuit has rejected any *per se* rule mandating independent police corroboration of a confidential informant. *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999) (citing *United States v. Harris*, 403 U.S. 573, 576 (1971); *United States v. Farese*, 612 F.2d 1376, 1378 (5th Cir. 1980)).   Instead, the court considers circumstances including the informant's veracity and basis of knowledge in assessing probable cause.

*Brundidge* is a close analogue.   In that case, the confidential informant (described in the opinion as a "CI") pointed out a motel room to the affiant and identified the subject inside by a nickname, telling the officer that he had seen in the room large quantities of cocaine powder along with both uncut cocaine base "cookies" and cocaine base prepared for distribution. *Brundidge*, 170 F.3d at 1353.   Applying *Gates*, the *Brundidge* court found

---

[4]  Wright has not offered any authority for the proposition that an informant's motivation—whether working for pay, consideration on charges, or some other carrot—is a material consideration in the probable cause analysis.   Regardless, the court has considered the affidavit's failure to disclose the informant's history of paid work but nevertheless finds that this omission does not undercut the finding that the totality of the circumstances support probable cause.

that this detailed description, combined with "a statement that the event was observed firsthand," was strong evidence of the informant's basis of knowledge—enough to have "made up for any weaknesses in the CI's veracity." *Id.* But the court independently assessed the informant's veracity, finding to be "satisfactory" the warrant's recitation "that the CI had provided information to law enforcement 'at least' eight times in the past and that the CI was 'truthful and reliable' on each occasion. Also, the CI's past tips led to the arrest of five persons and the recovery of $3,500 in illegal drugs." *Id.* These facts supported a finding of probable cause.

Through the lens of *Brundidge*, the instant facts also establish probable cause. Wright's informant described the apartment to Dailey and, as in *Brundidge*, relayed that she had seen illegal drug activity in the apartment. She identified Wright by a nickname, just as the CI did in *Brundidge*. But where the *Brundidge* CI described the subject only as a "black male," Wright's informant gave the description of a "black male in his [40s], dark complexion, approximately 6'1["], approximately 240 pounds and ball haircut." Doc. 19-1 at 4. Officers may corroborate an informant's allegations in multiple ways. "Independently confirming that what she said is true is one way; creating circumstances under which she is unlikely to lie is another." *United States v. Foree*, 43 F.3d 1572, 1576 (11th Cir. 1995). The informant's specific description of the suspect "meant that the CI was unlikely to lie, because 'if the warrant issued, lies would likely be discovered in short order and favors falsely curried would dissipate rapidly.'" *Brundidge*, 170 F.3d at 1353–54 (quoting *Foree*, 43 F.3d 1576). Both the level of detail in describing the subject and

14

the informant's firsthand basis of knowledge tend to show probable cause for the search.

This is to say nothing of the controlled drug buy described in the affidavit, which undercuts Wright's core premise that the affidavit lacks independent corroboration.   The *Brundidge* CI merely saw drugs in the subject's motel room.   But Wright's informant did the *Brundidge* CI one better—first she told Dailey that "Ballhead" was selling drugs out of his apartment, then she made a controlled buy from him under Dailey's "direct control and supervision." Doc. 19-1 at 4.   The buy is described in some detail in the affidavit, which recounts that the informant walked to the apartment, was allowed to enter, and requested cocaine powder from Ballhead, who retrieved the cocaine from the closet and handed it to her in exchange for money provided to her by MPD. Doc. 19-1 at 4.   While "controlled buy" is a law enforcement term of art that is not defined in the affidavit, there is at least some promise of corroboration implicit in this description of the purchase and the statement that it was accomplished under an officer's "direct control and supervision."   In this way, the description of the controlled buy buttresses the court's finding of probable cause. *See, e.g.*, *United States v. Horne*, 198 F. App'x 865, 871 (11th Cir. 2006) (finding a controlled buy described in an affidavit sufficient to establish probable cause).   The throw-away allegation that the informant has brought about "the prosecution of numerous offenders" may be "'entitled to only slight weight,'" *Foree*, 43 F.3d at 1576 (quoting *United States v. Miller*, 753 F.2d 1475, 1480 (9th Cir. 1985)), and is less specific and more conclusory than the reliability statement in *Brundidge*, but under the totality of the circumstances this is not

fatal to the warrant.[5]

Having found that the affidavit adequately establishes the reliability of the informant, the court may easily dispense with the claim that the evidence from the search should be suppressed due to the affidavit's failure "to identify which factual assertions were 'based on the personal knowledge of this affiant and on facts obtained by [MPD].'" Doc. 16 at 4 (quoting Doc. 19-1 at 4).   As the Government notes in its briefing, that Supreme Court has long held that "where law enforcement authorities are cooperating in an investigation . . . the knowledge of one is presumed shared by all." *Illinois v. Andreas*, 463 U.S. 765, 771 n.5 (1983) (citing *Whiteley v. Warden*, 401 U.S. 560, 568 (1971)); *accord United States v. Cotton*, 721 F.2d 350, 352 (11th Cir. 1983) (finding reasonable suspicion based on officers' "collective knowledge").   The failure here to distinguish between what Dailey observed firsthand and what she was told by a fellow officer does not preclude a finding of probable cause.

At any rate, the court finds that the MPD officers' reliance on this search warrant fits squarely within the good-faith exception first announced in *United States v. Leon*, 468

---

[5]  The record developed at the suppression hearing reveals that the entire dispute over the sufficiency of the probable cause stated in this search warrant could have been avoided with minimal effort and forethought. Dailey testified that she outfitted the informant with both an audio and video recording device for the controlled buy.  These audio and video recordings, which are in evidence, corroborate the informant's allegations in material respects.  And Dailey listened in real time to the audio feed while the controlled buy was taking place and reviewed the video immediately afterwards, so she knew the recordings corroborated the informant at the time she prepared the affidavit.   By failing to include these facts in the affidavit, Dailey invited the instant challenge to her informant's reliability.  Dailey could have informed the authorizing judge that she possessed audio and video recordings of the controlled purchase and that her review of these recordings corroborated the informant's recitation of events by, for example, depicting an individual who matched Ballhead's description conducting an apparent drug transaction inside the target apartment.   This simple recitation would have made her probable cause virtually airtight without requiring any additional investigative steps.

U.S. 897 (1985). *Leon* "stands for the principle that courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause." *United States v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002). This exception to the exclusionary rule applies in "all but four limited sets of circumstances." *Id.* at 1313. Only one is conceivably relevant here, as Wright's counsel conceded during oral argument. *See* Tr. I at 115. This exception comes into play "where the affidavit supporting the warrant is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Martin*, 297 F.3d at 1313 (quoting *Leon*, 468 U.S. at 923). However, for the reasons set forth above the court finds that the warrant was not so completely lacking in probable cause that it was unreasonable for the MPD officers to rely on it. *Cf. United States v. Robinson*, 336 F.3d 1293, 1297 (11th Cir. 2003) (finding *Leon* good-faith reliance even where district court found that the facts in the warrant did not support probable cause). The Government has carried its burden of demonstrating that the *Leon* good-faith exception would rescue the evidence seized from Wright's apartment even if the court found the warrant to be unsupported by probable cause.

### 2. *Interview*

The Government has not, however, carried its burden of proving that Wright waived his right to counsel during his interview. The United States Supreme Court announced in *Miranda* what has become, in the fifty years since, one of the bedrock principles of American criminal jurisprudence: that those suspected of crimes must be expressly advised

of their constitutional rights—including their Fifth Amendment guarantee of counsel—prior to any custodial interview. *Miranda*, 384 U.S. at 469–76 (holding also that the right to counsel during in-custody interrogation is "indispensable to the protection of the Fifth Amendment privilege").   In addition, the right to counsel "is sufficiently important to suspects in criminal investigations . . . that it 'requir[es] the special protection of the knowing and intelligent waiver standard.'" *Davis v. United States*, 512 U.S. 452, 458 (1994) (quoting *Edwards v. Arizona*, 451 U.S. 477, 483 (1981)).   As a result, "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present," *Miranda*, 384 U.S. at 474, or "the suspect himself reinitiates the conversation." *Davis*, 512 U.S. at 458 (citing *Edwards*, 451 U.S. at 484–85).

Of course, there are few absolutes in law enforcement, and accused individuals may mince words or equivocate in their requests for counsel.   This is one reason the Supreme Court, in the years since *Miranda*, carefully defined the contours of the inquiry into a suspect's invocation of his right to an attorney.   "To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry." *Davis*, 512 U.S. at 458–59 (citing *Connecticut v. Barrett*, 479 U.S. 523, 529 (1987)).   Invocation of the right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991).   Critically, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to

18

counsel," the officer is not necessarily required to discontinue questioning. *Davis*, 512 U.S. at 459.   This is a fact-intensive inquiry, in which the characterization of the request may depend on "events preceding the request or of nuances inherent in the request itself." *Smith v. Illinois*, 469 U.S. 91, 99–100 (1984).

Here, the court finds that Wright's statements, when placed in the context of the circumstances surrounding them, constituted an unequivocal invocation of his right to counsel.   Dailey advised Wright of his rights, concluding with the sentence, "If you want to answer questions now, you can do so, but you can stop at any time."   Wright's immediate response was, "Naw, I'd like my lawyer."   Dailey then repeated this statement back to him: "You'd like your lawyer?"   Wright answered, "Yeah."   If there is ambiguity in these statements, the court fails to perceive it.   And Wright then responded negatively on two separate occasions to the question, "You don't want to answer no questions?"   Again, there was nothing equivocal about Wright's refusal to proceed with questioning prior to consulting with an attorney.   The interview should have ended there.

This exchange stands in sharp contrast to the ambiguous invocation in *Davis*. There, the suspect originally waived his right to counsel but later stated, "Maybe I should talk to a lawyer." *Davis*, 512 U.S. at 455.   Immediately upon hearing this statement, the interviewing agents told the suspect "that if he wants a lawyer, then we will stop any kind of questioning with him." *Id.*   They also refused to continue until the suspect clarified whether he was "asking for a lawyer or . . . just making a comment about a lawyer." *Id.* The *Davis* suspect responded, "No, I'm not asking for a lawyer," and later, "No, I don't

want a lawyer." *Id.*   When, after another hour of questioning, the suspect stated, "I think I want a lawyer before I say anything else," the agents ceased all questioning of him. *Id.* The Supreme Court held that the suspect did not unequivocally request an attorney when he mentioned, "Maybe I should talk to a lawyer," and praised the agents' "good police practice" in asking follow-up questions aimed "to clarify whether or not he actually wants an attorney." *Id.* at 462.   The same cannot be said of Wright's interrogation.   There is nothing ambiguous about proclaiming, "I'd like my lawyer," when it follows immediately after an advisement of Fifth Amendment rights.   Certainly Wright's request was more definite and more forceful than the *Davis* suspect's "Maybe I should talk to a lawyer." This is also true of Wright's statements when compared with suspect statements found to be ambiguous in post-*Davis* Eleventh Circuit decisions. *E.g.*, *United States v. Carruthers*, 458 F. App'x 811, 819 (11th Cir. 2012) (holding that suspect's question, "Do I need an attorney?" was not clear invocation of right to counsel).

Moreover, Dailey's follow-up questioning resulted in three separate reaffirmations of Wright's desire not to answer questions without a lawyer present.   Only then did Dailey resort to asking, "So you're ready for us to send you to jail?"   In context, this question reasonably may be interpreted as an effort to apply pressure in order to convince Wright to answer questions without an attorney.[6]   The *Davis* court may have "decline[d] to adopt a

---

[6] Hubbard offered an apparent defense of Dailey's question in testifying that MPD's standard procedure after a suspect invokes his right to counsel is to "start describing the process of booking in." Tr. II at 23. If in fact this is standard operating procedure at MPD, this technique raises a red flag with respect to MPD interrogations in general, although of course there are less coercive ways to begin an informative conversation about "the process of booking in" than the question Dailey chose.

rule requiring officers to ask clarifying questions," but it also praised the use of these questions because they "help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel." *Davis*, 512 U.S. at 461–62.   But Dailey took a technique designed as a suspect's shield and turned it into her sword.   To endorse this tactic would subvert the rationale behind clarifying questions, transforming them into another tool for pressuring suspects not to invoke their rights.

Ultimately, "[t]he law in this area is clear: once an accused requests counsel, the officer cannot ask questions, discuss the case, or present the accused with possible sentences and the benefits of cooperation." *United States v. Gomez*, 927 F.2d 1530, 1539 (11th Cir. 1991) (citations omitted).   This rigid rule is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Davis*, 512 U.S. at 458.   But Dailey did exactly what the law prohibits in floating the possibility of jail after Wright invoked his right to counsel, and she did so in a way that arguably carried the implicit promise that whether Wright would go to jail turned on his cooperation. Under the rule in *Edwards*, Wright should not have been "subject to further interrogation by the authorities until counsel ha[d] been made available to him, unless [he] himself initiate[d] further communication." *Edwards*, 451 U.S. at 484–85.   The interrogation recording makes clear that Wright agreed to answer questions only after his request for counsel was not honored and only when Dailey forced him to choose between jail and

continued questioning.   This is not the type of re-initiation *Edwards* contemplates.

The interview should have ended when Wright first invoked his right to counsel, or—at the latest—when he confirmed his request for a lawyer.   Anything Wright said after he requested an attorney cannot be used against him.   The exclusionary rule mandates the suppression of the portion of Wright's interview that occurred after his invocation of counsel at the time 00:51 on the audio recording. *Michigan v. Harvey*, 494 U.S. 344, 362 (1990) ("[S]tatements improperly taken after the invocation of the right to counsel . . . must be excluded from the State's case in chief to ensure compliance with *Miranda*'s dictates.").

### IV.    CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge:

1.     That the Motion to Suppress (Doc. 16) be GRANTED to the extent it seeks the suppression of Wright's interview, and DENIED in all other respects.

2.     That the Motion for Disclosure of Informant (Doc. 18) be DENIED.

It is further ORDERED that the parties are DIRECTED to file any objections to this Recommendation on or before **August 31, 2018.**   Any objections filed must identify the specific findings in the Magistrate Judge's recommendation to which the party is objecting. Frivolous, conclusive, or general objections will not be considered by the district court. The parties are advised that this recommendation is not a final order of the court, and therefore it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the district

court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the district court except upon grounds of plain error or manifest injustice. *See Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); *Stein v. Reynolds Secs., Inc.*, 667 F.2d 33 (11th Cir. 1982).

DONE on the 23rd day of August, 2018.

GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE